IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

KIANA BIRCH,

Plaintiff,

v.

DANIEL MILLER, and
SHERIFF GENE CLAPS,

Defendants.

_____

**COMPLAINT AND JURY DEMAND**
_____

Plaintiff, Kiana Birch, by and through her attorneys of the Civil Rights Litigation

Group, hereby alleges for her complaint and jury demand, as follows:

**INTRODUCTION**

1.      This is a civil rights action seeking damages for an obvious use of

excessive force by an Adams County deputy during an investigation over a domestic

dispute. While investigating a simple property destruction issue, officers searched for

and located a woman who sought to avoid contact with police by hiding under an RV in

a junkyard/lot. In the course of getting the woman out and placing her in handcuffs,

Deputy Daniel Miller needlessly punched Ms. Birch in the face because she failed to

follow commands and/or because she verbally criticized the officer, moments earlier.

2.      This follows a troubling history of Adams County deputies using force –

and in particular punching people in the face – because subjects merely fail to follow

1

commands and/or verbally criticize officers. The law does not support that such passive failures or verbal criticism can justify significant force, and certainly not disproportionate force that serves no law enforcement purpose. Adams County has been put on notice through other instances and lawsuits. Yet, it continues to train its deputies that force in response to mere non-compliance is appropriate. It has failed to train officers to avoid striking people in the face. It has permitted an unconstitutional custom and practice of misconduct to fester that must be stopped.

3.    Deputy Miller was eventually charged and criminally prosecuted for assaulting Ms. Birch because a good samaritan officer from another agency – the Colorado State Patrol – came forward and reported the force as excessive and unnecessary. If not for that report, the incident would likely have been swept under the rug by the Adams County Sheriff's Office, like so many other past uses of similar force.

4.    Plaintiff seeks damages for physical and emotional harm, dignitary injuries, as well as punitive sanctions to punish and deter this flagrant disregard of Mr. Birch's and other similarly situated person's Constitutional rights.

## JURISDICTION AND VENUE

5.    This action arises under the Constitution and laws of the United States, and 42 U.S.C. § 1983. Plaintiff's state law claims are brought pursuant to C.R.S. § 13-21-131 and the Colorado Constitution.

6.    Subject matter jurisdiction regarding the feral claims is proper pursuant to 28 U.S.C. § 1331. Supplemental subject matter jurisdiction for the state law claims is proper pursuant to 28 U.S.C. § 1367.

7.    Venue is proper in the District of Colorado because the incidents and resultant injuries to the Plaintiff giving rise to this action occurred in Adams County, Colorado.

8.    Jurisdiction supporting the Plaintiff's claim for attorney's fees and costs is conferred by 42 U.S.C. §1988 and C.R.S. § 13-21-131(3).

## PARTIES

9.    Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

10.    Plaintiff Kiana Birch was at all times relevant to the claims set forth herein a resident of the State of Colorado.

11.    Defendant Deputy Daniel Miller was, at all times relevant to the subject matter of the claims in this action, employed as a deputy peace officer by the Adams County Sheriff's Office, and acted under color of state law. He is identified in his individual capacity

12.    Defendant Sheriff Gene Claps is the duly elected Sheriff of Adams County, Colorado, and is responsible for the training, supervision, policies, and practices of the Adams County Sheriff's Office and its deputy employees. He is identified in his official capacity.

## FACTUAL BACKGROUND

13.    Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

3

14.    On March 17, 2025, Plaintiff's romantic partner contacted police to report that Ms. Birch had thrown rocks at or otherwise caused property damage to his truck during a domestic dispute.

15.    Deputy Miller and several other Adams County deputies, as well as at least one Colorado State Patrol Trooper were routed to the call at a local junkyard/lot.

16.    At the time the officers arrived, Ms. Birch was not present. She had left the conflict to avoid escalation and sought to avoid contact with anyone.

17.    Ms. Birch's partner informed the officers that she was upset and intoxicated and had left on foot, likely to some unknown corner of the junkyard/lot.

18.    Deputy Miller told another officer that Ms. Birch would be charged with obstructing an officer and resisting arrest, even though Ms. Birch had not engaged in any conduct that could be reasonably be construed as obstructive or resistive under the law at that time.

19.    No officer had even had the opportunity to tell her Ms. Birch she would or could be under arrest or charged with any crime; officers were still investigating whether there was a crime committed.

20.    In the course of investigating whether a crime had been committed, officers searched for Ms. Birch around the lot.

21.    Deputy Sgt. Bacon spotted Ms. Birch underneath an RV. She was laying diagonally underneath the vehicle, with her head close to the side of the vehicle and with the remainder of her body stretching underneath the RV.

4

22.    Sgt. Bacon called over other officers, including Trooper Bradford and Defendant Miller.

23.    Defendant Miller approached the side of the RV where Ms. Birch was visible and within arm's reach. He saw Ms. Birch's head and shoulders poking out from under the RV.

24.    Trooper Brandford told Ms. Birch that she could come out from under the RV or officers could bring her out, stating "its up to you, you let me know."

25.    Ms. Birch wept in response.

26.    No one told Ms. Birch that she was under arrest.

27.    Immediately, Defendant Miller pulled out his Taser, pointed it at Ms. Birch, and began threatening to Tase her while shining a laser-light from the weapon at Ms. Birch.

28.    This frightened Ms. Birch. She responded by immediately putting up her hands, showing she was no threat, and informing the deputy she had no weapon.

29.    Defendant Miller momentarily put down the Taser, grabbed Ms. Birch by an arm, and in tandem with Trooper Bradford, pulled Ms. Birch halfway out from under the RV in a manner that left Ms Birch lying on her left side and her body bent at the waist around a tire, her legs still underneath the vehicle.

30.    Ms. Birch protested that she had done nothing wrong.

31.    Defendant Miller continued to yank on her arm while yelling at Ms. Birch to turn over.

32. Defendant Miller released her arm and pointed his Taser at Ms. Birch, again.

33. Defendant Miller then escalated the threat. He charged the Taser, creating a high-pitched electrical humming sound, pointed the Taser at Ms. Birch's face at close range, and yelled for her to turn over or he was going to Tase her.

34. This further frightened Ms. Birch. She was overwhelmed by the threat of the Taser and focused on that aspect of the Defendant deputy's communication.

35. Additionally, Ms. Birch could not turn onto her stomach because of the way she had been pulled out, her body was bent and curved around a vehicle tire (almost hugging it), and her hands were up to avoid being shot with the Taser.

36. She repeatedly informed the officers that she had no weapon, while putting her hands up into view of Defendant Miller so that he would not shoot and/or feel the need to use more force.

37. She was obviously behaving as a fearful person, overwhelmingly concerned with the Taser pointed in her face.

38. As Defendant Miller continued to threaten her with the Taser – both verbally and with the electrical hum of the Taser cycling and repeatedly getting louder, Ms. Birch repeatedly told the officers that they had no reason to use a Taser, and that she had no weapon, while demonstrating that she was no threat with her open and empty hands in the air. She was clearly afraid the officer would use excessive and unnecessary force.

39.    Defendant Miller repeatedly yelled for her to turn onto her stomach.

40.    When she failed to turn onto her stomach, Defendant Miller pulled the trigger of the Taser. The Taser malfunctioned, but still made an eerie, threatening sound.

41.    Trooper Bradford grabbed Ms. Birch's arm and pulled backward (in the opposite direction officers had previously requested), so that her torso was lying face-up and her back was on the ground, while the bottom portion of her body remained lying sideways – still partially wrapped around the vehicle tire where officers had left previously yanked and left it.

42.    Ms. Birch was still focused on avoiding the officers threats of force, holding her hands up.

43.    Defendant Miller then yelled for Ms. Birch to "turn on your stomach or we are going to punch you in the fucking face."

44.    Ms. Birch did not know what to do with the sensory barrage that included escalating yelling, a Taser pointed at her face, the high-pitched Taser sound threatening an electrical shock, the conflicting commands, the involuntary manipulation of her body, and her clear fear of what the officer(s) might do – all while she was intoxicated or impaired.  She simply continued to make visible her open and empty hands, showing that she represented no threat, while verbally protesting the officer's threats of violence.

45.    As Ms. Birch held both hands up and out, Trooper Bradford placed a handcuff on her right wrist and took control of it, while Defendant Miller grabbed her left hand.

7

46.    At that point, officers had both of her wrists/hands.

47.    After a couple of seconds, Ms. Birch registered that Defendant Miller had just threatened to punch her, and began to criticize the officer for threatening to punch a woman.

48.    Either because of her failure to turn on her stomach as commanded and/or because of her verbal criticism, Defendant Miller rapidly and viciously used an open hand to smash and/or slap Ms. Birch's face against the side of the RV.

49.    Defendant Miller then, additionall, punched Ms. Birch in the face with a closed fist

50.    Ms. Birch loudly cried out and wept.

51.    Trooper Bradford told Defendant Miller to back off and cool down, while he took over the arrest and took Ms. Birch into custody.

52.    Trooper Bradford had no problem assisting her out from under the vehicle, without threats of violence.

53.    Ms. Birch suffered significant pain and bruising.

54.    When in the patrol car, she also suffered a visible panic attack and she vomited on the floor and seat of the vehicle.

55.    Defendant Miller filled out a probable cause affidavit, under oath, asserting that Ms. Birch had committed the crimes of obstructing a police officer and resisting arrest based on her leaving the scene before officers arrived and/or her passively failing to follow commands.

8

56.    The criminal charges against Ms. Birch were eventually dismissed.

57.    Trooper Bradford later reported to a supervisor that Defendant Miller used excessive force, stating:

> I immediately intervened/stopped Deputy Miller after striking Kiana in the face to prevent excessive use of force. From my point of view, I did not deem that a punch to the suspect's face was a necessary level of physical force for the situation.

58.    Defendant Miller later claimed that he did not intend to punch her in the face, but only attempted to punch Ms. Birch in the shoulder. However, his conduct was in conformity with the express threat that he issued moments before he punched her, which cast his statements and intent immediately in doubt.

59.    As a result, of the conduct, the report by Trooper Bradford, and credibility problems regarding Deputy Miller's justification, Deputy Miller was eventually criminally charged with assaulting Ms. Birch.

60.    The Adams County Sheriff's Office should be applauded for doing the right thing and cooperating with the investigation that culminated in the DA's office criminally charging Deputy Miller.

61.    However, this was not the first time an Adams County deputy had punched someone in the face (or other vulnerable areas), used force in response to non-active resistance, or used force in response to verbal criticism.

62.    The Adams County Sheriff's Office has permitted a pattern of unconstitutional conduct by its deputies to culminate in this incident long beforehand, including through several known examples.

63.    For example, in July of 2023, Adams County Deputy Ezekiel Spotts

stopped in front of a mother and autistic daughter while they were exiting a Walmart in Thornton. The girl off-handedly criticized the officer, saying "its stupid to stop in the walkway." The deputy followed the two outside as they walked toward their car in the parking lot and ignored the officer pursuing from behind. The deputy eventually caught up with them and ordered the girl to close the car trunk so that he could photograph her license plate. When she failed to follow the command, the deputy grabbed the girl by the throat, and punched her so hard she fell to the ground. When the mother tried to intercede to stop and/or de-escalate the violence, the deputy punched her in the nose and the head. Deputy Spotts did not face any discipline because an investigation found there remained questions about "who the initial aggressor was." The officer was sued and the department defended his actions.

64.    In April of 2023, Adams County Deputies Eric Vanloo stopped a vehicle with two young minors inside for a purported city ordinance violation. The deputy ordered the driver to step out of the vehicle and opened the vehicle door from the outside. The young man failed to act immediately, vocalizing protest including, "for what," and "you cant open my door like that." In response, the deputy violently yanked the minor out of the car and threw him to the ground, while the minor yelled out, "what the fuck is wrong with you." Deput Vanloo then pounded the young man with three consecutive punches to the face, while he was on the ground and presenting no threat, and while another deputy looked on in approval and failed to intervene. The deputy was sued and the department defended his actions, concluding the force was within policy and "justified as a hard empty hand technique designed to control defensive resistance of

10

refusing to lay flat on his stomach."

65.    On December 3, 2019, Anthony Perez was assaulted by Adams County deputies. The incident, captured on a cell phone video, showed Mr. Perez telling officers "I can't breathe" while he was on the ground defenseless, and the officers punched him in the head. Before the video came to light, deputies claimed that Mr. Perez was resisting arrest, which was untrue. Again, as has been common, Adams County deputies reacted to comments from Mr. Perez that they apparently perceived as challenging their authority with extraordinary violence. The Sheriff's Office defended the officers' actions as justified.

66.    In September of 2018, Adams County Deputy Chad Jenkins was investigating a car accident and attempted to interview a potential witness who was talking on the phone. The deputy viewed John Jordan as uncooperative and told him to put his hands behind his back. When Mr. Jordan did not immediately comply with the command, Deputy Jenkins grabbed his arm and slammed him to the ground. Mr. Jordan stuck out his arm to catch the ground and prevent his face from being struck, and Deputy Jenkins kicked his arm out from under him causing his face to hit the ground. Deputy Jenkins charged Mr. Jordan with obstructing and resisting arrest, despite Mr. Jordan's conduct not fulfilling the elements of the crimes. The charges were later dismissed. Deputy Jenkins did not face discipline. Instead, when he was sued, the sheriff's department defended him and his actions. In 2024, the case made its way to the court of appeals and the Tenth Circuit held that the deputy violated Mr. Jordan's First and Fourth

11

Amendment rights, because an officer may not arrest for verbal criticism/speech, and Mr. Jordan could not have actively resisted arrest by merely failing to follow commands or bracing himself from injury.

67.     On August of 2018, Jeffrey Helvie was assaulted by Adams County deputies during a routine traffic stop. Mr. Helvie failed to answer a deputy's questions and was ordered out of his car. The deputy then opened the car and threw Mr. Helvie to the ground and dragged him away. The officer dropped his knee to Mr. Helvie's back and chest, while he was on the ground and not fleeing or threatening, causing Mr. Helvie to suffer broken ribs from the officer's use of excessive force. The officer was not disciplined, but was defended.

68.     The same type of misconduct evident in this string of incidents is evident in this case, where an Adams County deputy uses force because a subject either passively fails to follow orders or verbally criticizes the deputy. And in common fashion, the Adams County deputies involved targeted and/or struck vulnerable areas of the subject's body with unnecessary force that was disconnected from any legitimate law enforcement purpose, including, most pertinently, the subject's face.

69.     This similar, repeated behavior by Adams County deputies evidences a pattern and practice of misconduct, which has been reinforced by the Office's acquiescence, ratification, lack of training/supervision, and/or failure to discipline.

70.     The Adams County Sheriff's Office, now led by current Sheriff Gene Clap, has affirmatively approved of and defended punches to the face as a legitimate and

12

defensible police tactic, despite there being no legitimate or proportional law enforcement purpose associated with such strikes other than to cause harm.

71.     The Adams County Sheriff's Office failed to train and/or supervise its officers to refrain from targeting vulnerable areas of a suspect's body, despite force in locations such as people's faces being vulnerable to disproportionate harm/injury.

72.     The Adams County Sheriff's Office has affirmatively trained its deputies that it is permissible to use force in response to subjects who merely passively or defensively fail to follow demands of an officer, despite the Constitution requiring an "immediate threat" and/or "active resistance to arrest" to justifiably use force.

73.     The Adams County Sheriff's Office has failed to train and/or supervise its deputies to distinguish the passive failure to follow commands from the "active resistance" normally considered to be demonstrative of justification of reasonable force, thereby leaving officers to believe they have discretion to choose to use closed-fisted violence in response to mere passive failures or defensive protective maneuvers, and in disproportionate, overly-injurious ways, such as targeting vulnerable areas of a person's body/face.

74.     The Adams County Sheriff's Office has failed to adequately train, supervise, and/or harden its officers to resist reacting to verbal criticism and/or to refrain from violence in response to verbal criticism levied at them, as required by the First Amendment.

75.     These last two failures to train and supervise are in spite of direct notice

from the Tenth Circuit Court of Appeals on the issue.

76.    The Adams County Sheriff's Office operates its own police academy. Through training used for many years, the Sheriff of Adams County has taught officers to use aggressive tactics when attempting to investigate individuals, make arrests, or otherwise interact with members of the community, including aggressively threatening and using force such as closed-fisted punches, instead of de-escalating or using alternatives such as soft/empty hand techniques, which results are on display in each of the examples cited above and other circumstances, and which led to the criticism from an officer from another department in this very case, who was provided better training.

77.    The pattern of behavior evidences serious systematic and obvious deficiencies in the training, supervision, and policies of the Adams County Sheriff's Office, which must be fixed for the protection of those to whom its deputies come into contact.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983, Fourth Amendment and**
**C.R.S. § 13-21-131, Article II §7**
*Excessive Force*
**(Against Defendant Miller)**

78.    Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

79.    Defendant Miller intentionally and knowingly, applied unnecessary, unreasonable, and excessive force to Plaintiff by slamming her face into the side of an RV and punching her in the face with a closed fist.

14

80.    The force described above was in response to Ms. Birch's mere failure to act as he demanded and/or in response to her verbal (First Amendment protected) criticism, and not in response to any threat or proportional "active resistance."

81.    Even if Defendant Miller perceived a form of defensive resistance in the circumstances, he failed to consider that multiple officers surrounded Palintff, while she lay on the ground, and that there was no meaningful risk of her threatening, evading arrest, or resisting arrest – most pertinently because she was never told she was under arrest and never threatened harm against anyone.

82.    Defendant Miller failed to use less-intrusive or non-force alternatives that were more appropriate, such as soft-handed or empty hand/control techniques.

83.    Even if the conduct described above was used in conjunction with a legally cognizable seizure or detention and/or some force may have been justified, the force used was wholly unnecessary and reached a level above and beyond that needed to effectuate any legally recognizable detention or arrest; the force chosen was plainly disproportionate to any legal need.

84.    The actions as described herein of Defendant Miller, while acting under color of state law, deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including the right to freedom from unreasonable seizure as guaranteed by the Fourth Amendment to the Constitution of the United States of America, made actionable pursuant to 42 U.S.C. § 1983, and those secured by the Colorado Constitution, Section 7, made actionable

15

pursuant to C.R.S. § 13-21-131.

85.     Defendant Miller's conduct was the motivating and proximate cause of the violations and Plaintiff's injuries, including physical, emotional, and dignitary harms.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983, Fourth Amendment and**
**C.R.S. § 13-21-131, Article II §7**
*First Amendment Retaliation*
**(Against Defendant Miller)**

86.     Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

87.     Plaintiff engaged in Constitutionally protected speech in the presence of the officer, including criticizing Defendant Miller for threatening the use of a Taser and/or threatening to punch a woman in the face, without any pending threat of harm or other law enforcement justification.

88.     In response to and/or within seconds of her verbal criticism, Defendant Miller intentionally and knowingly, applied unnecessary, unreasonable, and excessive force to Plaintiff by slamming her face into the side of an RV and then punching her in the face with a closed fist.

89.     The force described above occurred within close proximity to the criticism, which close temporal proximity lends an inference that the protected speech was a substantial or motivating factor for the officer's actions.

90.     The force described above would chill a person of ordinary firmness from

engaging in such criticism, as a reasonable person would be dissuaded from criticizing or further speaking out against an officer who would or had applied physical force like this in response to officer criticism.

91.    The actions as described herein of Defendant Miller, while acting under color of state law, deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including the First Amendment right to freely express verbal criticism of an officer in the performance of their public duties, which is made actionable through Section 1983, and/or those rights similarly secured by the Colorado Constitution, Article II, Section 7, made actionable pursuant to C.R.S. § 13-21-131.

92.    Defendant Miller's conduct was the motivating and proximate cause of the violations and Plaintiff's injuries, including physical, emotional, and dignitary harms.

### THIRD CLAIM FOR RELEIF
**42 U.S.C. § 1983,** *Monell*
*Unconstitutional Custom/Practice, Policies, and Affirmative Training;*
*Failure to Train and Supervise*
**(Defendant Sheriff Gene Clap in his Official Capacity)**

82.    Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

83.    Sheriff Gene Clap is the duly elected Sheriff of the Adams County Sheriff's Office and is responsible for the deputies under his employ, the training provided to his officers, and the disciplinary mechanisms and other supervisory means necessary to require deputies to act within the bounds of decency and constitutional

limits.

84.    As described above, this incident followed after numerous incidents of excessive force by Adams County deputies in similar circumstances, including deputies using excessive force, targeting vulnerable areas likely to cause greater harm than necessary (most pertinently subject's faces), using force in response to the mere failure to respond as opposed to "active resistance," and/or using force in response to verbal criticism, as opposed to physically threatening conduct.

85.    The Adams County Sheriff's Office substantially acquiesced in this pattern of misconduct by failing to curb similar types of misconduct by its deputies; failing to train, retrain, discipline, or otherwise supervise its deputies; and otherwise permitting the practices to continue, which unnecessarily put subjects to whom the deputies came into contact at risk of harm and/or indifferently risked the constitutional violation of similarly situated persons rights, like Plaintiff.

86.    The Adams County Sheriff's Office affirmatively trained and/or authorized deputies that it was permissible to use force on persons who merely failed to follow commands, instead of distinguishing and instructing on the limitations of "active resistance" imposed by the Fourth Amendment of the Constitution.

87.    The Adams County Sheriff's Office failed to train and/or supervise its officers to treat failures to respond to commands and/or verbal criticism as inapplicable justifications for force, and/or left officers with the impression that they had discretion to use force in response to such circumstances, up to and including force on suspects in

18

vulnerable areas, such as Plaintiff.

88.    The Adams County Sheriff's Office failed to adequately train, supervise, and/or harden its officer against using force in response to First Amendment protected verbal criticism, as required by the federal and state constitutions.

89.    Sheriff Clap and his office acted with deliberate indifference by ignoring prior excessive force precedent, the string of incidents identified above, and the Tenth Circuit's pronouncement on the issue, which culminated in the event at issue here.

90.    These affirmative actions and omissions predictably led to the violations at issue here, and were a moving force behind the constitutional violations and injuries complained of here. They must be stopped.

 **WHEREFORE**, Plaintiff respectfully prays that this Court enter judgment in his favor and against all Defendants for compensatory damages, as referenced above, for punitive damages, for interest as allowed by law, for costs, expert witness fees, and reasonable attorney fees as allowed by statute or as otherwise allowed by law, and for any other and further relief that this Court shall deem just and proper.

**PLAINTIFF DEMANDS TRIAL TO
A JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 7th day of January, 2026.

*s/    Raymond K. Bryant*
Raymond K. Bryant
Civil Rights Litigation Group, LLP
1543 Champa St., Suite 400
Denver, CO 8020

19

P:  720-515-6165
F:  720-465-1975
raymond@rightslitigation.com

20